June Term, 1860.

WELCH
v.
SACKETT et al.

---

WELCH vs. SACKETT and others.

12  243
76  535

12  243
79  452

12  243
99  320

12      243
54 LRA 888n
54 LRA 905n
54 LRA 906n

The concurrent execution and delivery of two chattel mortgages upon the same property, to different parties, makes the mortgagees tenants in common of the property mortgaged, and they should join in an action for the unlawful taking or the conversion of it.

A mortgagee of personal property may maintain replevin against a person taking the same in defiance of his right, although he was not in actual possession of the property, if, by the terms of the mortgage, he was entitled to take possession whenever he deemed that the safety of the debt required it.

Where a debtor made several chattel mortgages to certain of his creditors, in their absence and without their knowledge, and handed the same to his own attorney with a declaration that he delivered them to him for the use of the mortgagees, and the attorney, at his request, filed the mortgages in the office where by law such mortgages were required to be filed, and wrote to the mortgagees, notifying them of the execution of such mortgages, but attachments were levied upon the same goods, by other creditors of the mortgagor, before the mortgagees had received notice of, and had assented to, or accepted said mortgages: *Held,* that the attachments were entitled to preference.

ERROR to the Circuit Court for *Dane* County.

The plaintiffs below, who composed two firms, doing business under the names respectively of *Sackett, Belcher & Co.* and *Widdefield, Cohn & Co.*, sued the defendant *Welch* for trespass in taking and carrying away from a building occupied as a store by one Harding, certain goods, alleged to belong to the plaintiffs.

The answer was, 1st. A general denial.   2d. As to a part of the goods, particularly described, that the defendant took the same, as the agent of J. Dahlman & Co., by virtue of a mortgage executed to them by said Harding, and filed on the 18th of December, 1858, in the office of the clerk of the city of Madison, where said Harding resided ; and as to the residue of said goods, that the defendant seized the same on the 23d of December, 1858, by virtue of sundry writs of attachment against the property of said Harding, duly issued out of the circuit court of Dane county on that day, and delivered to the defendant as sheriff of said county, to be executed ; that said goods were, at the time of said seizure, the property of said Harding ; that the plaintiffs claim to be the owners of said goods by virtue of two mortgages, bearing date December 20th, 1858, purporting to be executed by said Harding, one in favor of *Sackett, Belcher & Co.*, and the other in favor of said *Widdefield, Cohn & Co.;* but that said mortgages were made by said Harding, and filed, without the request, assent or knowledge of the plaintiffs; and that at the time of said seizure, said mortgages had not been delivered to the plaintiffs, or either of them, nor to any agent or attorney authorized by them to receive the same, nor had they any knowledge that the same had been executed, or ever assented to or ratified the same.   The defendant further alleged in his answer, the rendition of judgment against said Harding, on the 26th of January, 1859, in each of the actions in which said warrants of attachment were issued, the issuing of executions upon such judgments, the sale of the property attached, and the application of the proceeds, first to the satisfaction of the mortgage to Dahlman & Co., and the residue, *pro rata*, upon said executions.

The principal question in controversy between the parties

was, whether there had been a delivery of the mortgages to
the plaintiffs prior to the levy of the attachments.

Upon the trial of the cause, the plaintiffs gave in evidence three notes executed by said Harding, one dated August 11, 1858, payable to *Widdefield, Cohn & Co.*, for $278,62, at six months after date, and two dated August 9, 1858, payable to *Sackett, Belcher & Co.*, one for $815,48, at four months after date, and the other for $659,10, at six months after date; and also two mortgages upon all the goods, &c., described in the complaint, made by said Harding, one to *Widdefield Cohn & Co.*, and the other to *Sackett, Belcher & Co.*, for the security of the notes held by them respectively, each of which mortgages bore date December 20th, 1858, and contained a clause authorizing the mortgagees to take possession of the goods whenever they should deem that their interest, or the safety of the debt required it.

The defendant objected to the introduction of the notes and mortgages in evidence, upon the ground that they showed that the plaintiffs had not a joint interest in the goods described in the complaint, but the court overruled the objection, and the defendant excepted. The defendant admitted, for the purposes of the trial, that on the 23d day of December, 1858, he took and carried away the goods described in the complaint. The proof as to the execution of the mortgages under which the plaintiffs claimed title, was substantially as follows:

Harding, the mortgagor, testified that the mortgages were executed by him in Madison, on the 20th of December, 1858; that the plaintiffs resided in the city of New York, and were not present at the time of making the mortgages; that the witness employed Mr. Haskell, an attorney, to draw them up, and paid him for them; that the plaintiffs did not know of the making of the mortgages until a letter could reach them; that he told the firm of Collins, Atwood & Haskell, to write to all the parties to whom the mortgages were given; that at the time the defendant took the goods under the attachments, on the 23d of December, the witness had not heard from the plaintiffs; that a letter cannot go to New York and back in three days; that the debts for which the

June Term,
1860.

WELCH
v.
SACKETT et al.

mortgages were given were all honest and *bona fide*; that at the time of the execution of the mortgages to the plaintiffs, he executed another upon the same goods to Swift & Co., who afterwards gave up the mortgage and had an attachment levied on the goods, and another mortgage to Phelps, Bliss & Co., which has been paid; all the mortgages amounting to $6,000 and upwards, and the mortgaged property being worth between $2,100 and $2,200, at retail prices, at Madison.

Mr. Haskell testified in substance as follows: "I drew the chattel mortgages from Mr. Harding to the plaintiffs, on the 20th day of December, 1858; they were made in our office; after they were signed, I attached the schedules, and then handed the mortgages to Mr. Harding, and said to him, 'Here, Mr. Harding, are your mortgages; they are now at your disposal.' Mr. Harding then said, 'I suppose they must be delivered, must they not? I deliver the mortgages to you for the mortgagees.' And then he delivered them to me. He also requested me to notify the New York creditors that he had executed these mortgages to them, and to see that they were filed. I handed the mortgages to George E. Woodward, and requested him to carry them to the city clerk's office and see that they were filed. The mortgages read in evidence are the same mortgages. We wrote to the mortgagees on the 22d of December, 1858, informing them of the making of these mortgages, and on that day I deposited in the post office at Madison, the letters postpaid, directed to the creditors in New York. I gave the mortgages to Woodward to file, because it was time for me to go to dinner, and I thought it would make no difference who carried them to the clerk's office. Woodward is the son-in-law of Harding. I acted as the attorney of Harding in drawing these mortgages. In reply to his question asking if they must not be delivered, I told him it would be a sufficient delivery of the mortgages if he put them on file in the city clerk's office, and told the clerk what they were for, and wrote to the mortgagees, or that if he chose, he might deliver them to me, and that I would see them filed and notify the mortgagees. When he delivered the mortgages

to me, he said, 'I deliver them to you for the mortgagees,' or possibly, instead of the word 'mortgagees,' he used the word 'creditors,' or 'them,' but some word meaning the same thing. I saw the letter that my partner, Mr. Atwood, wrote to Swift & Co. The ones that I wrote were substantially the same. He wrote two of the letters, and I wrote two. I did not advise Mr. Harding that in order to render the mortgages valid to the creditors, they must first do some act to accept them. I advised Harding to make a delivery of the mortgages, because I understood that a delivery was essential to their validity, but I did not advise him to appoint me the agent of the mortgagees. Up to the time of the delivery, I was acting for Harding, and the New York creditors had not employed me to act for them."

George E. Woodward testified, that at the time the mortgages were executed, Mr. Haskell, in the presence of Mr. Harding, requested witness to file the mortgages, and he took them to the city clerk's office, a little after noon of that day, and filed them.

Mr. Harding, being recalled by the plaintiffs, further testified as follows: "I delivered the chattel mortgages which have been introduced in evidence, to Mr. Haskell, for the use of the mortgagees. I asked Haskell if it was not requisite to deliver them, and he said I might deliver them to the city clerk, or to him for them. Then I handed the mortgages to Haskell, and said, 'I deliver these to you for the mortgagees.' I never have had or controlled the mortgages since that time, and have never seen them since until I saw them here."

The defendant read in evidence a letter from Messrs. Collins, Atwood & Haskell to Swift & Co., of New York, dated December 22d, 1858, in which, after informing them that Mr. Harding had, on the 20th instant, executed four chattel mortgages of even date, on his stock, to the four New York firms hereinbefore mentioned, they say: " Mr. Harding is confident you will ratify the proceeding, and he is now professing to act as your and their agent, and keeping the funds arising from sales apart, for the purpose of applying them *pro rata* in payment of the claims of the above named houses. An acceptance of the security given would not, of course,

June Term,
1860.

WELCH
v.
SACKETT et al.

bar your right to assert your whole claim. We would there-
fore suggest that some action be taken by you to avail your-
selves of the mortgage security. We have written a like let-
ter to each of the above firms." The defendant also proved
the execution of the chattel mortgage to Dahlman & Co., re-
ferred to in the answer, and also the several warrants of at-
tachment, judgments and executions mentioned in the an-
swer, and that he levied upon and sold the goods, &c., by
virtue of said writs, as in the answer alleged.

After the testimony was closed, the defendant's counsel
requested the court to give the jury the following instruc-
tion: "If the jury believe from the evidence, that Hard-
ing made the mortgages read in evidence by the plain-
tiffs, in the absence and without the knowledge or consent of
the plaintiffs at the time of the execution thereof, and that
they were not delivered to some of them, or some person au-
thorized by the plaintiffs to act for them, then the plaintiffs
cannot recover in this action, unless they have also proven
that they did some act approving and ratifying the delivery
of the mortgages to Mr. Haskell, before the defendant made
the levies under and by the attachments in his hands;"
which instruction the court refused to give in terms, but
did qualify the same as follows: "but if you find that the
mortgages were delivered to a third person for the sole use
and benefit of the mortgagees, then the assent of the mort-
gagees will be presumed or implied, if you find that the
mortgages were beneficial to them, and it is a sufficient de-
livery."

The defendant also asked the court to instruct the jury as
follows: "The placing of the mortgages read in evidence
by the plaintiffs, in the office of the city clerk, by the said
Harding, or his agent or attorney, without the knowledge of
the plaintiffs, and without any direction or intimation to said
clerk, by Harding, or his agent or attorney so placing them
on file, that the mortgages were placed on file to remain there
under his charge for the use and benefit of the mortgagees,
is not such a delivery and filing of said mortgages as will
entitle the plaintiffs to hold the goods mentioned therein,
against creditors attaching before the plaintiffs had knowl-

June Term, 1860.

WELCH
v.
SACKETT et al.

edge of the making of said mortgages or had ratified the acts of Harding or his said agents;" which instruction the court refused to give in terms, but qualified the same by adding thereto as follows: "unless you find that the mortgagor, Harding, caused the mortgages to be so filed, with the intention of a full delivery of the mortgages in this way, and for the sole benefit of the mortgagees."

The defendant's counsel also asked the following instructions: "If the jury believe that Harding was entitled to the possession of the goods mentioned in said mortgages, at the time the defendant made the levy upon them by virtue of an attachment against the goods of Harding, then the plaintiffs cannot recover;" and, "Although the jury should believe that the mortgages were valid between Harding and the plaintiffs, yet if Harding was entitled to the possession of the goods at the time of the levy by the defendant, then the defendant was authorized by the attachment in his hands, to take possession of the goods and hold and sell the interest of Harding therein, and this defendant is not liable to the plaintiffs in this action;" which instructions the court refused to give in terms, but did qualify the same as follows: "unless you find that the plaintiffs, at the time of the commencement of this suit, were entitled to the possession of this property, or were the owners thereof. In this state the mortgagee of chattels is entitled to the possession at any time after the execution of a mortgage, unless it is stipulated that the property shall remain in the possession of the mortgagor."

To the refusal of the court to give the said instructions in the terms asked for, and to the said qualifications attached thereto, the defendant excepted.

The defendant also asked the court to instruct the jury, that if the plaintiffs, on the 23d day of December, 1858, and before the levy of the attachment by the defendant, were not in possession of the goods mentioned in the mortgages, they could not recover in this case; which instruction was refused, and the refusal excepted to. The court, in its general charge, instructed the jury as follows: "The question whether the mortgages were delivered to the mortgagees before the levy of the attachments, is one of some difficulty. If they were

June Term,
1860.

WELCH
v.
SACKETT et al.

not delivered before the levy, they are of no avail in this suit. They do not become effectual for any purpose until delivered. Upon this question I charge you, that if you find that Harding, the mortgagor, executed the mortgages and delivered them to Mr. Haskell, with the direction to place them on file in the city clerk's office for the use and benefit of the mortgagees, and that such was the declared intention of the mortgagor, and that they were so filed in the city clerk's office before the levying of the attachments, it was a good and valid delivery of the mortgages, even though the mortgagees themselves had no knowledge thereof, and had given no direction concerning such mortgages, until after the attachments in this case were levied upon the property. If you find that the mortgages were made in good faith, and were so delivered and filed in the city clerk's office before the levy of the attachments, the plaintiffs are entitled to recover;" to the giving of which instruction the defendant also excepted. The jury found a verdict in favor of the plaintiffs for $1,860, and judgment was rendered thereon.

*Smith, Keyes & Gay*, for plaintiff in error.

1. The plaintiffs claim by two distinct chattel mortgages, one to each firm, securing different sums; they consequently have not a *joint* interest (if any) in the goods, and the damage done to them is to different and separate amounts, and not one entire joint damage; they could not therefore join as plaintiffs, and the notes and mortgages were improperly admitted under the pleadings. 1 Chitty on Plead., p. 64; *Chambers vs. Hunt*, 3 Harr., 339.

· 2. The plaintiffs' mortgages, if held good, were not due when the defendant levied the attachments; they had neither the actual nor the constructive possession of the goods, and cannot maintain trespass for the taking of the property from Harding, the mortgagor, upon the attachments against him. *Hull vs. Carnley*, 1 Kern., 501; *same case*, 17 N. Y., 202.

3. The mortgages were executed without the knowledge of the mortgagees, and received and filed by Mr. Haskell, who never had any communication or correspondence with the plaintiffs, or authority from them to act in their behalf, but was acting solely as the attorney for Mr. Harding; and

the plaintiffs knew nothing whatever of the transaction until after the defendant below had levied the attachments on the goods. The mortgages are, therefore, void as against the attaching creditors. *Dale vs. Bodman*, 3 Met., 139, 143; *Hague vs. Rolleston*, 4 Burr., 2174; *McCourt vs. Myers*, 8 Wis., 236; *Church vs. Gilman*, 15 Wend., 656, 660; 2 Hilliard on Mort., 278; 2 Hilliard on Real Property, 267, §.16; Fearne on Contingent Remainders, 360–364 inclusive; *Sampson vs. Thornton*, 3 Met., 275; *Goodsell vs. Stinson*, 7 Black., 437; *Ferguson vs. Miles*, 3 Gilman, 358; *Hulick vs. Scovil*, 4 id., 159.

A deed may be delivered to a third person for the benefit of a grantee, and if he afterwards assent to the act, the deed will take effect from the date of delivery, unless the rights of third persons shall be affected by it. In that event the doctrine of relation would not apply, for it is a rule that it shall not be permitted to apply so as to do wrong to strangers. 7 Blackf., 439; *Case vs. DeGoes*, 3 Caines' Rep., 261; 4 Johns., 230; 12 Pick., 141; 5 S. & R., 523; *Jackson vs. Bodle*, 20 Johns., 184; 13 Conn., 83.

The weight of authority is against the doctrine that a deed is delivered when it is recorded. 7 Blackf., 440; *Jackson vs. Phipps*, 12 Johns., 418. The ratification of an unauthorized act cannot affect intervening rights. *Sturtevant vs. Robinson*, 18 Pick., 180; *Beals vs. Allen*, 18 Johns., 363. The presumption that a person will accept a deed because it is beneficial to him, has never been carried so far as to consider him as having accepted it. *Hulick vs. Scovil*, 4 Gilman, 159. Where a deed was sealed and acknowledged and left for record in the clerk's office, but neither the grantee nor any person in his behalf was present to receive it, it was held inoperative. *Jackson vs. Dunlap*, 1 Johns. Cases, 114; *Verplank vs. Sterry*, 12 Johns., 550. To constitute the delivery of a deed or chattel mortgage, the grantor must part not only with the possession but with the control of it, and deprive himself of the right to recall it. *Com. Bank vs. Reckless*, 1 Halst. Ch. Rep., 430; *McCourt vs. Myers, supra.* The mortgages in this case were left at the city clerk's office, without any instructions or directions whatever, and could have been

WELCH
v.
SACKETT et al.

withdrawn at any time by Woodward, Harding or Haskell. *Collins, Atwood & Haskell*, for defendants in error.

Chattel mortgages like those in this case, give to the mortgagees the right of immediate possession of the goods, and vest in them title sufficient for them to maintain trespass against any third person who wrongfully takes away the goods. *Ferguson vs. Thomas*, 26 Maine, 499 ; *Stewart vs. Hanson*, 35 Maine, 506 ; *Case vs. Winship*, 4 Blackf., 425 ; *Woodruff vs. Halsey*, 8 Pick., 333 ; *Pettis vs. Kellogg*, 7 Cushing, 456 ; *Rich vs. Milk*, 20 Barb., 616 ; *Cotton vs. Marsh*, 3 Wis., 221.

The facts testified to in this case constituted a valid delivery of the mortgages, and they became as effectual at the instant of such delivery (there being no proof of refusal or dissent on the part of the mortgagees to accept the security) as if they had been at the same time delivered to the mortgagees in person. It was wholly immaterial that the mortgages were made in the absence, and without the knowledge or any previous agreement or request of the mortgagees ; and that there was no subsequent express acceptance of or assent to them by the mortgagees, before the levy of the attachments, three days afterwards, as assent will be presumed until dissent is shown. Sheppard's Touchstone, 57, 58, 72 ; *Butler vs. Baker*, 2 Coke, 68–72, cited in 1 Salkeld, 301 ; *Thompson vs. Leach*, 2 Ventris, 198 ; *Buffum vs. Green*, 5 N. H., 71 ; *Hodges vs. Hodges*, 9 Mass., 307 ; *Wilt vs. Franklin*, 1 Binney, 502 ; *Read vs. Robinson*, 6 Watts & Sergt., 329 ; *Skipwith's Ex. vs. Cunningham*, 8 Leigh, 271 ; *Doe vs. Knight*, 5 B. & C., 671, (12 E. C. L. R., 351) ; *Halsey vs. Whitney*, 4 Mason, 206 ; *Tompkins vs. Wheeler*, 16 Peters, 106 ; *Church vs. Gilman*, 15 Wend., 656 ; *Merrills vs. Swift*, 18 Conn., 257 ; *Cooper vs. Jackson*, 4 Wis., 537 ; *McCourt vs. Myers*, 8 Wis., 236 ; *Buffington vs. Curtis*, 15 Mass., 529.

Nor was there a misjoinder of parties plaintiff in the action in the circuit court. The mortgages both including the same goods, and both executed and becoming operative at the same instant of time, one to Messrs. *Sackett, Belcher & Co.*, and the other to Messrs. *Widdefield, Cohn & Co.*, gave to them a common interest in the whole and every part of the

goods, and entitled them to a joint possession. Under such ownership these firms, as well at common law as under the statute, might or must have joined as plaintiffs in an action against a trespasser upon the goods. Coke's Litt., (782–3) 609 ; *Hart vs. Fitzgerald*, 2 Mass., 509 ; *Hill vs. Gibbs*, 5 Hill, 56 ; *Rich vs. Penfield*, 1 Wend., 380 ; Rev. Stat., Ch. 122, § 20 ; 1 Chitty's Pleadings, 64, 65, 66 ; *Bloxam vs. Hubbard*, 5 East, 407 ; *Addison vs. Overend*, 6 Durnford & East, 357 ; *Sedgworth vs. Overend*, 7 id., 150 ; *Pickering vs. Pickering*, 11 N. H., 141 ; *Daniels vs. Daniels*, 7 Mass., 135.

*By the Court*, DIXON, C. J. The first question involved in this case, I think, was correctly decided. It seems to me clear that the concurrent execution and delivery of the two chattel mortgages made the mortgagees tenants in common of the property conveyed. The legal effect was the same as it would have been if the goods had been mortgaged to them by one instrument, to be held by them as a security for their respective claims, and the proceeds, in case of a sale, to be divided between them in proportion to the amounts thereof severally. If an absolute sale of a chattel were to be made at one and the same time to two different persons, by instruments in writing, purporting to convey the whole of it, executed and delivered to each at the same moment, each having a knowledge of the sale to the other, (a transaction perhaps not likely to happen, but nevertheless not impossible), I imagine that we should find little difficulty in saying that the vendees thereby became tenants in common, each holding an undivided moiety of the article purchased. Neither having any superior right or equity, but both standing on an equality in those respects, the property would be divided. The same would be true of conveyances of real estate under the same circumstances. It can make no difference that the sales or conveyances are conditional. Their effect in this respect is the very same, except so far as the interests of the several vendees or mortgagees are limited and determined by the amount of the demands due to each. The defendants in error (plaintiffs below) were, therefore, not only enabled, but it was incumbent upon them, provided the

plaintiff in error so insisted, to join in their action. *Hill vs. Gibbs*, 5 Hill, 56.

The second question has been determined adversely to the plaintiff in the case of *Frisbee vs. Langworthy*, decided at the present term, 11 Wis., 375. We there held that a mortgagee of personal property, not in actual possession, might maintain replevin against a person taking the same in defiance of his right, where, by the terms of the mortgage, he was entitled to take possession whenever he deemed that his interest or the safety and security of the debt required. Such was the case of the present mortgagees.

The question which was considered by far the most important, and upon which the counsel bestowed. the most attention, citing nearly all the English and American authorities, calls for the determination, in a case where a mortgage of personal property from a debtor to a creditor, is executed in the absence and without the knowledge of the latter, and delivered to a stranger for his use, of the time at which the title to the property mortgaged vests in the mortgagee, as between him and another creditor of the mortgagor who acquired an interest in it by attachment between the time of the delivery to the stranger and the time when the mortgagee actually received notice of and accepted it. Whilst it must be admitted that there is some conflict in the adjudications upon this subject, still both natural reason and the weight of authority tend to the same conclusion, which is, that the title in such case only vests from the time there is an acceptance in fact on the part of the mortgagee. On principle I think it may be laid down as an indubitable proposition in such case, that the title does not vest in fact, until the mortgagee has actually assented to the conveyance; and consequently, that until such assent it remains in the mortgagor. While all the courts acknowledge the correctness of principles which lead unerringly to this result, and clearly and positively exclude any other, it is somewhat strange that any should have been found to adopt a conclusion directly opposed to it. All agree that it is necessary to the validity of every deed or conveyance, that there be a grantee who is not only willing, but who does in fact accept it. It is a con-

tract, a parting with property on the part of the grantor, and an acceptance of it by the grantee. Like every other contract, there must be a meeting of the minds of the contracting parties, the one to sell and convey, and the other to purchase and receive, before the agreement is consummated. If there be anything in legal principles, or in common sense, it is an unpardonable absurdity to say, that a contract can be completed in the absence and utter ignorance of one of the contracting parties; that he can or does, under such circumstances, assent to, or agree to become bound by it. The idea that a contract could be thus made, and that title to property could pass into a party without his knowledge or consent, and out of him without any motion or. act of his signifying his willingness, but merely by his refusal to receive it at all, had its origin at a period in the history of the common law, when the legal mind, instead of being governed in its conclusions by a steady application of the clear and rational principles of the law to plain matter of fact, and by arguments to be drawn therefrom, was too frequently influenced by a mysterious and fanciful logic, that depended for its support upon artfully devised fictions and falsehoods, which for the most part were as repugnant to reason as they were unnecessary to the proper administration of justice. The discovery that such things could be done, is, I believe, attributable to the inventive skill of Justice VENTRIS, as exhibited in the case of *Thompson vs. Leach*, 2 Vent., 198, decided about the year 1690; at least several courts and judges since that time, with many complaints, have agreed in giving him the credit of having proved something on this subject which none of them could understand. The substance of his proposition is, that a deed of lands made to a party, without his knowledge or consent, and placed in the hands of a third person for his use, is a medium for the transmission of the title to the grantee, and takes effect so as to vest it in him, the instant the deed is parted with by the grantor, and if the grantee, upon receiving knowledge of it, rejects it, such rejection has the effect of revesting the title in the grantor by a species of remitter. Inasmuch as this is the only attempt at sustaining it by argument to be found in the books, the

June Term, 1860.

WELCH v. SACKETT et al.

more recent cases having, without discussion, gone off almost entirely on the strength of the *authorities*, I propose to examine some of the positions assumed by him, upon which his argument mainly depends, and from which, I think, its fallacy and the incorrectness of his conclusions will be clearly made to appear. He admits, what is universally conceded to be an indispensable element of every grant, namely, that it should be accepted by the grantee, and says, "that an assent is not only a circumstance, but it is essential to all conveyances ; for they are contracts, *actus contra actum*, which necessarily suppose the assent of all parties ;" but avoids the difficulty into which the admission of this well settled principle brings him, by saying, "that because there is a strong intendment of law, that for a man to take an estate is for his benefit, and no man can be supposed to be unwilling to that which is for his advantage," therefore the law will presume that the grantee has accepted a conveyance before a knowledge of its execution and delivery has come to him. Upon the foundation of this hypothesis, misnamed by him *a presumption of law*, the falsity and unreasonableness of which are so self-evident that reasoning can hardly make them plainer, he proceeds to the erection of his superstructure. Assent or acceptance on the part of the grantee or other party to a deed or other instrument, by means of which the title to property, whether real or personal, is to be transferred to him, or by which he is in any other manner to become bound, is a *fact*, the truth of which is to be established by competent evidence, before such deed or other instrument can be adjudged to have a legal existence. Like every other fact, it may be established by direct evidence, or its existence may be inferred or presumed from other facts already in proof. But I deny that the existence of one fact is to be inferred or presumed from the existence of others, when the connection between the former and the latter is such that according to the course of nature it plainly appears that the former cannot exist. In other words, I deny that the existence of any fact may be shown by proving others which conclusively show its non-existence, or that the legitimate mode of establishing the truth of a matter is by indubitably proving its

falsehood. Justice does not require, nor does the law tole-
rate such an absurdity. The learned justice says, that where
a deed is executed by the grantor and delivered to a stran-
ger for the use of the grantee, without the previous advice,
direction or authority of the grantee, and without his knowl-
edge, the law will presume that the grantee assents to it, the
moment it is delivered to the stranger. *Assent* is an act of
the mind—that intelligent power in man by which he con-
ceives, reasons and judges, and of which it is a primary, in-
variable and most familiar law that it cannot act with refer-
ence to external objects, until, through the medium of the
senses, it is impressed with or *knows* their existence. Hence,
without such impression or knowledge, there can be no assent,
no *actus contra actum ;* and to presume it in opposition to
the facts, is to presume that which is impossible ; which the
law, the rules and precepts of which are in conformity with
the unchanging truths of nature, will never do.

"A presumption," says Mr. Starkie, "may be defined to
be an inference as to the existence of one fact, from the ex-
istence of some other fact, founded upon a previous experi-
ence of their connection. To constitute such a presumption,
it is necessary that there be a previous experience of the
connection between the known and inferred facts, of such a
nature that as soon as the existence of the one is established,
admitted or assumed, the inference as to the existence of the
other immediately arises, independently of any reasoning
upon the subject." Presumptions thus defined, he says, are
either *legal and artificial* or natural, and may be divided into
three classes. 1st. Legal presumptions made by the law itself,
or presumptions of *mere law.* 2d. *Legal* presumptions made
by a jury, or presumptions of *law and fact.* 3d. Mere natu-
ral presumptions, or presumptions of *mere fact.* The defini-
tion which he so clearly and accurately gives, although ap-
plied by him to all presumptions, is perhaps more strictly
applicable to the latter class. The assent to a deed or other
instrument by the grantee or other party, being a matter of
*mere fact,* it is obvious that to the latter class also would be-
long a presumption in relation to such assent, in a case where
such presumption could properly be indulged. But, whether

the presumption be assigned to the one or the other of these classes, the position of the learned justice is equally untenable ; for in no instance, not even the most artificial and arbitrary, does the law indulge in presumptions which are directly contradicted by the facts on which they are predicated. The known facts, though often insufficient of their own natural force and efficacy, to generate in the mind a conviction or belief of those which are inferred, are always, to say the least, not inconsistent with or opposed to them.   If for example we take the case instanced by Mr. Starkie, of the presumption of the satisfaction of a bond after the lapse of twenty years, without payment of interest or other acknowledgment of its existence, while if a single day less than the twenty years has elapsed, such presumption does not arise, we find it to be extremely arbitrary and technical.   No natural reason can be given why the lapse of the last day should operate to produce in our minds a conviction or belief of payment, while the lapse of all the days and years preceding it does not so operate.   Such is not its effect.   But as from common experience of the affairs of men, there arises in the mind, after the lapse of many years without payment of interest or other acknowledgment, a strong probability that a debt has been satisfied, and as the law loves certainty and industriously avoids doubts, it has from these motives *arbitrarily* fixed a period of time at the expiration of which this probability shall ripen into and take effect as a presumption of law, and at which the rights and position of the parties in reference to such debt, flowing from the *mere lapse of time*, unaccompanied by other circumstances, shall become determinate and certain.   This presumption, which is in so many respects *artificial*, is in no respect inconsistent with the fact from which it is said to arise.   On the contrary, though not conclusively sustained, it is strongly corroborated by the fact; since experience teaches that it is very improbable that the holder of the bond would, unless it were satisfied, permit such a space of time to elapse without receiving the interest or obtaining from the maker some other evidence of its non-payment.   The same is true of that most purely artificial presumption, that a bond or other

specialty was executed upon a good consideration, which is so peremptory and absolute in its nature that it cannot be rebutted by evidence; whilst the consideration of another instrument, executed and delivered under precisely the same circumstances, and in the same words, but not under seal, may be freely inquired into and impeached; yet there the conclusion that it was made upon a good consideration is entirely consistent with the facts from which it is drawn; for there is much reason for supposing that without a good consideration, it would not have been sealed and delivered. Without multiplying illustrations, I think it will be found that in no instance (unless the present case is to form an exception) does the law infer the existence of facts in clear and direct opposition to those upon which the inference rests. It does not do so here. Reason rebels against it, and neither justice nor equity demands it. The only result of dropping the absurdity will be that, as in the present case, in a contest between two equally meritorious parties, the title to the property of which a conveyance was sought to be made, will be adjudged to be in him whom reason designates as the true owner.

The mistake of the learned justice consisted in his carrying the presumption of law so far as to say that it presumes that a person has consented to that of which he knows nothing, which is an impossibility; instead of saying, what was more truly said by the more logical and cautious courts and judges of his time, and by Lord ELLENBOROUGH, in *Stirling vs. Vaughn*, 11 East, 623, namely, that, if nothing appears to the contrary, the law presumes that he *will* accept that which is for his benefit, when he is informed of it, which assent, in the absence of intervening rights or equities, will have relation back to the time of delivery for his use, and make his title good as from that date. After a brief argument of this sort, he proceeds to say, "that very odd consequences and inconveniences would follow, if surrenders should be ineffectual till an express consent of the surrenderee," and that most disastrous effects upon estates and conveyancing in England would ensue, unless her courts adopted and upheld his absurdity. It is said that one error surely

gives rise to another and a greater.    This saying was never more aptly and forcibly illustrated, than by the fantastic feats which the learned justice makes the common law, the sober common sense of ages, perform by way of getting the title back again into the grantor in case the grantee refuses to accept the conveyance.    He says that after, by this kind of one-sided contract, it has got into him without his knowledge, it remains with him without his consent until he absolutely rejects and spurns the offer, and that then, by some magical power of the law, such rejection, without-deed or other writing, becomes an instrument of conveyance, by which the legal title to land is conveyed from one who has it to one who has it not, against the express wishes of the latter and in despite of his own deed, the highest and most solemn act known to the law, by which he could rid himself of it. It is not surprising that the learned and logical Chief Justice GIBSON, in *Read vs. Robinson*, 6 Watts & Sergeant, 329, while commenting upon what he calls "the masterly argument of Justice VENTRIS, in *Thompson vs. Leach*," says, that "the difficulty is to comprehend how the remitter can take effect without displacing intermediate interests springing from the rejected deed;" and then, as if in despair of ever comprehending it, he dismisses the subject from his mind by saying, "but the authorities conclusively prove that it may." All agree that neither the grantor nor the stranger who consents to receive and hold the deed, can, by their acts, bind the grantee, and that the latter may, on receiving notice of it, repudiate it altogether.    If the title vests in the grantee at once, it must, of course, vest according to the terms of the conveyance, and in the case of an absolute conveyance, he would have an absolute title.    If, after delivery to the stranger, and before notice to the grantee, a creditor of the latter should fasten upon the property by execution or attachment, no reason can be given why he could not hold it.    If it is the property of the grantee, it follows, as of course, that the creditor would have this right, and that he would at once acquire a lien to the extent of his demand.    Suppose, after this is done, that the grantee, on receiving notice, refuses to accept the conveyance, what becomes of the property?    Does

the refusal unbind and set the property free from the seizure of the creditors, and remit the title at once back to the grantor? Or does the intendment of Justice VENTRIS step in, in behalf of the creditor as well, and say, because the grant is presumed beneficial to the grantee, and he might, at some future period accept it, that therefore he shall be deemed to have accepted it before the seizure, and at a time when he was utterly ignorant of it, and thus enable the creditor to withhold the property from the grantor, by which means it would happen that although it was neither bought nor sold, the grantor would, without consideration, lose it, and the grantee enjoy the full benefit of it on the same terms? Knowing of no rational or satisfactory answers which can be given to these and various similar questions which will readily suggest themselves to the reader, I leave them to be replied to by those who maintain that the title to property, real or personal, may, without words written or spoken, or other act of transfer, be thus mysteriously passed and repassed between parties by contract. I deny that it may be. It seems to me very plain, that it does not pass in fact until the grantee has actually consented to receive it; and, as of course, that it remains with the grantor, who is unable, without such consent, to vest it in the grantee. No other conclusion is consistent with the doctrine that a grant is a contract, and that the assent of the grantee is necessary to give it validity. The justice assumed the question in controversy by saying that the execution and delivery of the deed to the stranger passed the title out of the grantor, and then he was under the necessity of resorting to these further absurdities in order to account for it; for he says, "that it is not a slight matter, but what the law much considers, and is very careful to have the freehold fixed," and not "under such uncertainty, as a stranger that demands right should not know where to fix his action." If he had considered that the operation of the deed was suspended, or that it did not take effect until the grantee had assented, he would have been saved the trouble of drawing so largely on his imagination to show where the title was, and how it was thereafter to be controlled. It is a matter of no small moment, and

of just pride to the bench of England, that Justice VENTRIS, at the time he wrote this wonderful argument, *dissented*, and that the other members of the court of common pleas, viz.: POLLEXFEN, chief justice, and POWELL and ROKEBY, associates, were of opinion in the case, "that there was no surrender till such time as the surrenderee had notice of the deed of surrender and agreed to it," and that it was so adjudged by that court; and that the case was afterwards taken by writ of error to the King's Bench, of which Lord HOLT was at the time chief justice, and the judgment of the common pleas "was there affirmed by the unanimous consent of the whole court." It was afterwards brought by error into the House of Lords, where, as it is said, upon the reasons contained in Justice VENTRIS' argument, the judgment pronounced in both superior courts was reversed. Thus we have on the one side the legal learning, and almost the unanimous opinion of the courts, and on the other the judgment of reversal of the House of Lords, the great majority of whom knew very little, and cared less, about the correct settlement of legal principles.

The argument is of a piece with that kind of reasoning once employed to prove that titles to estates were "in abeyance," "in *nubibus*," and "in *gremio legis*," the folly of which is so thoroughly exposed and exploded by the severe and searching logic of Mr. Fearne, in his admirable treatise on Remainders. See pages 360 to 364, inclusive. It was held, in case of a lease to one person for life, remainder to the right heirs of another still living, that no estate remained in the grantor; and because there was no heir, for the reason that no one can be heir during the life of his ancestor, but only after his death, and because the tenant took only a life estate, the remainder was said to be in abeyance, in the clouds, or in the bosom of the law. These opinions were founded upon the very same assumption as that of Justice VENTRIS, namely; that the remainder passed out of the donor at the time of livery, and consequently that no estate remained in him thereafter; and because the title must always be somewhere, the advocates of the doctrine sent it to the clouds; "though," says Mr. Fearne, "by some sort of

June Term, 1860.

WELCH
v.
SACKETT et al.

compromise between common sense and the supposition of an estate passing out of a man, when there is no person *in rerum natura*, no object beside hard and hardly intelligible words, for the reception of it at the time of the livery, they are compelled to admit such a species of interest to remain in the grantor, as upon the determination of the estate before the contingent remainder can take place, entitles the grantor, or his heirs, to enter and reassume the estate."

The questions are so closely allied, and the substrata of the two follies are so exactly alike, that Mr. Fearne's reasoning is fully in point. And it is certainly refreshing, after a perplexing and vain effort to understand that which never was and never will be intelligible, to take up an author, who, like Mr. Fearne, treats the subject upon the principles of common sense. He intimates a conviction, that instead of the title to estates being in the clouds, there is a much stronger probability of *caput inter nubilia condit*, of the head of the inventor of the fiction having been buried or hidden in them. He says: "I cannot but think it a more arduous undertaking, to account for the operation of a feoffment or conveyance, in annihilating an estate of inheritance, or transferring it to the clouds, and afterwards regenerating or recalling it at the beck of some contingent event, than to reconcile to the principles as well of common law as of common sense, a suspension of the complete, absolute operation of such feoffment or conveyance, in regard to the inheritance, till the intended channel for the reception of such inheritance comes into existence." The same is true of the delivery of a deed to a third person for the use of the grantee, without his knowledge or previous direction. It is far more compatible with common law and common sense, to say that its operation is suspended until the happening of the event indispensable in the law to its validity, namely, an acceptance by the grantee, than to make the law perform the wonderful exploits of vesting and recalling the title contrary to its best settled and soundest principles. I am of opinion therefore, that the defendants in error took no interest in the goods in question by virtue of their mortgages, until after the plaintiff in error

had seized them upon process of attachment, and consequently, that they cannot maintain their action.

Much was said in this case, about the manner in which the mortgages were delivered. There can be no doubt that so far as the mortgagor was concerned, the delivery was good. They were placed by him in the hands of a stranger, to be by him delivered to the mortgagees, and thus passed beyond his reach and control, unless the mortgagees, within a reasonable time after notice, should refuse their assent. This made the delivery, as to the mortgagor, valid and binding, which is all I understand the author of the Touchstone to mean, when he says that a deed "may be delivered to any stranger for and in behalf and to the use of him to whom it is made." But a delivery by the donor to a third person, for the use of the donee, and an acceptance by the latter, are two very different things. By the former, the donor signifies his willingness to part with the property, whilst by the latter the donee makes known his assent to receiving it, and both must concur before the title is changed or affected. It was formerly, and may perhaps by some be still supposed, that there can be no delivery without at the same time an acceptance; that they are correlative, inseparable parts of the same transaction, and must both occur at the same instant of time; and hence, in part, the fiction of relation, by which in case of a delivery by the grantor to a stranger, the subsequent acceptance by the grantee was carried back in legal contemplation to the time when the grantor gave the deed to the stranger, in order to save the logic of the law and to preserve "the eternal fitness of things." It seems to me that every case in which it has been adjudged that there may be a delivery to a stranger, and that a subsequent ratification by the grantee will make the instrument effectual for the purposes intended, falsifies this notion and proves that in every such case there may be, what there is in fact, a delivery by the grantor at one time to a third party, and an acceptance by the grantee from such third party at a subsequent and different time. Such is the common sense of the transaction; and it is better and more rationally disposed of without than with the aid of the fiction. But if the fiction must

be employed, then the maxim, *in fictione legis semper subsistit* <span>June Term,</span>
*equitas*, applies, and it will not be allowed to operate when it <span>1860.</span>
infringes or violates the rights of strangers. It is only re- <span>Welch</span>
sorted to in furtherance of justice and to prevent injury. In <span>v.</span> <span>Sackett et al.</span>
this case the plaintiff in error is a stranger to the mortgages.
He represents the rights and interests of the creditors of the
mortgagor, who in good faith sued out and levied their at-
tachments upon the goods, thereby lawfully acquiring a lien
upon them; and it cannot be said to be in furtherance of
justice, to postpone their demands thus legally secured, to
those of the mortgage creditors, which are in no sense
more equitable or just. The struggle is between innocent
persons, to prevent loss, and the fiction ought not to be re-
sorted to for the purpose of helping one as against the other.
The transaction must be left to stand upon its simple and
naked truth.

It is unnecessary for me particularly to refer to the cases
cited by counsel. Those cited for the plaintiff in error, in
their principles *substantially* sustain the views which I have
taken. Many of those cited by the counsel for the defend-
ants in error, are not directly applicable, whilst some of them
clearly and positively uphold the opposite doctrine. Of this
latter character, besides the English, are *Buffum vs. Green*, 5
N. H., 71; *Wilt vs. Franklin*, 1 Binney, 502; and *Merrills vs.
Swift*, 18 Conn., 257. In the first it does not clearly appear
whether notice of the execution of the deed or the service of
the process of attachment took place first. Both happened
on the same day, but the court seem to adopt the theory that
the title vested before notice to the grantee, and therefore
the time of the service of the writ being immaterial, is not
particularly noted. The principle upon which the doctrine
rests is not discussed at all. The same is true of the case in 18
Conn. In both it is taken for granted that such is the effect
of a delivery to a stranger. In *Wilt vs. Franklin* there was
a dissenting opinion of Justice Brackenridge, in which the
fallacy of the reasoning of his two associates is so calmly and
clearly brought out that it would be folly for me to do more
than refer the reader to it. The case of *Doe ex dem. Garnons
vs. Knight*, 5 B. & C., 671, (12 E. C. L., 351,) was determined

upon the binding authority of previous adjudications. The question having hitherto remained undecided in this state, no such obstacle to its correct determination exists.

In the case of *Cooper vs. Jackson*, 4 Wis., 537, it was expressly ruled, that "it is essential to the legal operation of a deed, that the grantee named therein assents to receive it, and there can be no delivery without such acceptance, but such acceptance need not be in person; it is sufficient if authorized or approved by the grantee." In that case the title of the grantee was held to be good as against the judgment creditor of the grantor, upon the express ground that there was a previous understanding between the grantor and grantee that the deed should be executed by the grantor and delivered by him to the register of deeds, to be recorded. This the court says constituted the register the agent of the grantee for the purpose of receiving it. Upon this subject the following language is used: "The case at bar falls fully within the principle of *Hedge vs. Drew*," (12 Pick., 141, previously noticed and commented upon in the opinion). "Here the grantee saw the deed after it was drawn, and the parties came to the understanding that the deed should be executed and left with the register to be recorded. There was an absolute divesting by the grantor of his estate in the land, and the deed was delivered to the register, who, *pro hac vice*, may be considered the agent of the grantee to receive it. *It is readily distinguishable from the cases where the grantor executes the deed without the knowledge of the grantee*." In the case of *McCourt vs. Myers*, 8 Wis., 236, there was no attempt by the mortgagor to deliver the chattel mortgage to the city clerk, or any third person, for the use and benefit of the mortgagees, and consequently no question upon the effect of such delivery arose. The only point adjudicated was, that the mere act of the mortgagor in causing the mortgage to be filed in the office of the clerk, was not such a delivery as would operate to give the mortgagees any title or interest in the goods specified in the mortgage.

The judgment of the circuit court is reversed, and a new trial awarded.